**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| GINA MARIE HUFF and SOULMAZ HEYDARI,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; JOHN F. KELLY, in his official capacity as Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,<br><br>Defendants. | ) | No.: |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Gina Marie Huff and Soulmaz Heydari, for their Complaint for Declaratory and Injunctive Relief against Defendants Donald J. Trump, in his official capacity as President of the United States ("President Trump"); the United States Department of Homeland Security ("DHS"); John F. Kelly, in his official capacity as Secretary of Homeland Security ("Secretary Kelly"); the United States Department of State ("DOS"); and Rex Tillerson, in his official capacity as Secretary of State ("Secretary Tillerson"), state and allege as follows:

**INTRODUCTION**

1. This action arises out of the illegal and unconstitutional actions of President Donald J. Trump and the United States government.

2. As a candidate for President, Mr. Trump promised his supporters that he would ban all refugees and people of the Islamic faith from travelling to the United States – a "Muslim

ban." As President, Mr. Trump has delivered on that promise. Twice. After his first effort to do so by Executive Order was blocked by courts, President Trump issued a second order, the March 6, 2017 Executive Order titled "Protecting the Nation From Foreign Terrorist Entry into the United States." Like the first Order, the March 6, 2017 Executive Order violates federal law and the United States Constitution.

3. Plaintiffs Gina Marie Huff and Soulmaz Heydari, both United States citizens, are and will continue to be victimized and irreparably harmed by the latest Executive Order. Plaintiffs each filed a Petition for Alien Fiancé (Form I-129F) with the U.S. Citizenship and Immigration Services ("USCIS") to obtain a K-1 visa for their nonimmigrant foreign citizen fiancés to enter the United States so that they can promptly marry. Those petitions were approved by the USCIS, processed through the National Visa Center, and their respective fiancés have concluded all steps in the process overseas to obtain the K-1 visas. No grounds for denying those visas exist. But for the Executive Order, their fiancés would be granted visas and their marriages would take place.

4. But that cannot happen while the Executive Order stands. And, given that many of the underlying documents necessary for the process have expiration dates, the Executive Order will likely cause the process to fail. Preliminary and permanent injunctive relief is necessary.

5. Plaintiffs are not alone. President Trump's illegal and unconstitutional Executive Order inflicts irreparable harm on numerous people, both inside and outside of the United States. Injunctive relief is necessary not only to put a stop to the unwarranted injury inflicted on plaintiffs, but the injury to thousands of other innocent people as well.

## JURISDICTION & VENUE

6. This Court has Federal Question Jurisdiction under 28 U.S.C. § 1331 because this

action arises under the United States Constitution, the Administrative Procedure Act ("APA"), the Immigration and Nationality Act ("INA"), and other Federal statutes.

7. The Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the APA, 5 U.S.C. § 706.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1). The Executive Order at issue in this case inflicts injury on Plaintiffs and others across the United States, including this District, and a substantial part of the events that give rise to this claim occurred in this District. Each Defendant is an officer of the United States sued in his official capacity.

## PARTIES

9. Plaintiff Gina Marie Huff, an individual, is a United States citizen and resident of Wisconsin.

10. Plaintiff Soulmaz Heydari, an individual, is a United States citizen and resident of Texas.

11. Defendant Donald J. Trump is President of the United States, and he issued the March 6, 2017 Executive Order that is the subject of this Complaint.

12. Defendant U.S. Department of Homeland Security is a federal cabinet agency responsible for implementing and enforcing the Immigration and Nationality Act and the Executive Order that is the subject of this Complaint. DHS is a Department of the Executive Branch of the United States Government, and is an agency within the meaning of 5. U.S.C. § 552(f). United States Customs and Border Protection ("CBP") is an Operational and Support Component agency within DHS, and is responsible for detaining and removing non-citizens from Iran, Syria, Somalia, Sudan, Libya, and Yemen who arrive at air, land, and sea ports across the

United States.

13. Defendant John F. Kelly is the Secretary of Homeland Security. He is responsible for implementing and enforcing the INA and the Executive Order that is the subject of this Complaint, and he oversees CBP. He is sued in his official capacity.

14. Defendant U.S. Department of State is a federal cabinet agency responsible for implementing the U.S. Refugee Admissions Program and the Executive Order that is the subject of this Complaint. The Department of State is a department of the Executive Branch of the United States Government, and is an agency within the meaning of 5 U.S.C. § 552(f).

15. Defendant Rex Tillerson is the Secretary of State. He oversees the Department of State's implementation of the U.S. Refugee Admissions Program and the Executive Order that is the subject of this Complaint. The Secretary of State has authority to determine and implement certain visa procedures for non- citizens. Secretary Tillerson is sued in his official capacity.

16. Defendant United States of America includes all government agencies and departments responsible for the implementation of the INA, and for detention and removal of non-citizens from Iran, Syria, Somalia, Sudan, Libya, and Yemen who arrive at air, land, and sea ports across the United States.

## FACTS

## I. PLAINTIFFS' APPROVED PETITIONS TO OBTAIN K-1 FIANCÉ VISAS

### A. The Process for Obtaining K-1 Fiancé Visas

17. Under the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(15)(K)(i), a U.S. citizen can file a Petition for Alien Fiancé, or a Form I-129F, with the USCIS to obtain a K-1 visa for a nonimmigrant foreign national fiancé to enter the United States solely to conclude a valid marriage with the U.S. citizen within ninety days of admission into the United States.

18. The process for obtaining a K-1 visa is as follows. A U.S. citizen, the petitioner,

files the Form I-129F to petition the USCIS to recognize a foreign national, the beneficiary, as the person's fiancé. The USCIS reviews the documents submitted as evidence that the requirements for the K-1 visa are satisfied: both parties are free to marry; intend to marry within 90 days of the beneficiary's admission to the United States; and have met in person within two years of filing the petition.

19. In addition, the USCIS conducts a background check for national security, criminal records, and other information on both the petitioner and beneficiary. (*See* Fact Sheet: K-1 Visa Process And DHS-State Review, available at https://www.dhs.gov/news/2015/12/17/fact-sheet-k-1-visa-process-and-dhs-state-review).

20. If the USCIS is satisfied that the petitioner has met the criteria for the K-1, it will approve the I-129F and issue an I-797, Notice of Action, Approval Notice. The approved petition is valid only for a period of four months (it may be extended). An approved Form I-129F is recognition by the USCIS that the claimed relationship exists between the petitioner and beneficiary.

21. Once the I-129F is approved, the USCIS sends the approved petition to the Department of State National Visa Center ("NVC"). The NVC notifies the petitioner that it is time for the foreign national fiancé to apply for the K-1 visa at the embassy or consulate abroad. At this stage, the foreign national also completes and submit an online application form, Form DS-160 so he can schedule an interview at the embassy or consulate.

22. The Department of State conducts background checks on the visa applicant, including fingerprints and other checks similar to those conducted by USCIS, as well as checks of DOS systems and other interagency databases.

23. The foreign national fiancé schedules and attends an interview for the K-1 visa at

the embassy or consulate, submitting identification and civil documents, proof of the relationship, as well as a medical examination report completed by an approved physician.

24. As with the approved I-129F petition, many of the evidentiary documents, including the medical form and police certificates are time sensitive, some valid for only a few months.

25. After all the above steps are complete the Department of State consular officer determines whether any grounds of inadmissibility apply and whether to issue the K-1 visa. In doing so, the officer is required to determine admissibility "as if the alien were an applicant for an immigrant visa." 22 C.F.R. § 41.81(d).

**B. Plaintiffs' Approved K-1 Visa Petitions**

26. Gina Marie Huff is engaged to an Iranian national who resides in Armenia, and has resided there for the past two years. Both Ms. Huff and her fiancé are Christian.

27. On March 8, 2016, Ms. Huff filed her Form I-129F to obtain a visa for her fiancé to enter the United States so that they can marry. She provided with the petition supporting documentation demonstrating that she and her fiancé are both free to marry; intend to marry within 90 days of the his admission; and have met in person multiple times in the two years prior to filing the petition.

28. The USCIS approved Ms. Huff's petition on June 2, 2016, and sent the approved petition to the NVC who in turn sent it to the U.S. Embassy in Yerevan, Armenia. On July 26, 2016, Ms. Huff's fiancé submitted his DS-160 application online for the K-1 visa with the Department of State. He completed his required medical examination on August 15, 2016, and was interviewed by a Consular official on August 16, 2016.

29. Soulmaz Heydari is engaged to an Iranian citizen. Both Ms. Heydari and her fiancé are Muslim.

30. On September 6, 2016, Ms. Heydari filed her Form I-129F to obtain a visa for her fiancé to enter the United States so that they can marry. She provided supporting documentation demonstrating that she and her fiancé are both free to marry; intend to marry within 90 days of the his admission; and have met in person multiple times in the two years prior to filing the petition.

31. The USCIS approved Ms. Heydari's petition on October 7, 2016, and sent the approved petition to the NVC. On December 15, 2016, Ms. Heydari's fiancé filed Form DS-160 electronically with the Department of State. His petition was forwarded to the U.S. Embassy in Abu Dhabi by the NVC of the Department of State on January 9, 2017. He completed his required medical examination on February 26, 2017, and was interviewed by a Consular officer on February 28, 2017.

## II. PRESIDENT TRUMP'S ILLEGAL AND UNCONSTITUTIONAL TRAVEL BANS

### A. Candidate Trump Promises to Ban Refugees and People of the Islamic Faith from Entering the United States

32. A central tenet of Donald Trump's presidential campaign was his promise that he would ban refugees and people of the Islamic faith from entering the United States.

For example, on July 11, 2015, Mr. Trump gave a speech in Las Vegas arguing that Syrian Christian refugees were being discriminated against in favor of Muslims, claiming that "If you're from Syria and you're a Christian, you cannot come into this country, and they're the ones that are being decimated. If you are Islamic … it's hard to believe, you can come so easily." (*See* Louis Jacobson, Donald Trump says if you're from Syria and a Christian, you can't come to the U.S. as a refugee, Politifact (July 20, 2015) available at http://www.politifact.com/truth-o-meter/statements/2015/jul/20/donaldtrump/donald-trump-says-if-youre-syria-and-christianyou-/).

33. On December 7, 2015, Mr. Trump issued a press release calling for "a total and

complete shutdown of Muslims entering the United States." The press release states that "there is great hatred towards Americans by large segments of the Muslim population." (*See* Donald J. Trump Campaign, Donald J. Trump Statement on Preventing Muslim Immigration (Dec. 7, 2015) still available at www.donaldjtrump.com/press-releases/donald-j.-trump-statement-on-preventingmuslim immigration).

34. As reported in an article published the very next day, Mr. Trump plainly described what the customs process would look like for a Muslim non-citizen attempting to enter the United States: "[T]hey would say, 'are you Muslim?'" And, if they said they were Muslim, Mr. Trump confirmed they would not be allowed into the country. (*See* Nick Gass, Trump not bothered by comparisons to Hitler, Politico (Dec. 8, 2015) available at http://www.politico.com/trump-muslims-shutdown-hitler-comparison).

35. After the release was issued, Mr. Trump attempted to change the manner in which he described his ban:

- On July 17, 2016, Mr. Trump was interviewed by Lesley Stahl along with Vice Presidential candidate Mike Pence. When Ms. Stahl referenced Mike Pence's December 2015 tweet stating a Muslim ban would be offensive and unconstitutional, candidate Trump stated: "So you call it territories. OK? We're gonna do territories. We're not gonna let people come in from Syria that nobody knows who they are." (*See* 60 Minutes, CBS News at 10 (July 17, 2016) available at http://www.cbsnews.com/news/60-minutes-trump-pence-republicanticket/).

- In that same interview, Ms. Stahl asked Mr. Trump if he was changing his position on the Muslim ban. Mr. Trump responded, "No, I—call it whatever you want. We'll call it territories, OK?" When Ms. Stahl asked whether he no longer included Muslims, candidate Trump stated, "You know—the Constitution, there's nothing like it. But it doesn't necessarily give us the right to commit suicide, as a country, OK? And I'll tell you this. Call it whatever you want, change territories [sic], but there are territories and terror states and terror nations that we're not gonna allow the people to come into our country." *Id.*

- During a July 24, 2016 interview, Mr. Trump was asked whether he was "backing off on his Muslim ban[]," to which he replied "I actually don't think it's a pull-back. In fact, you could say it's an expansion." He further stated, "I'm looking

now at territories. People were so upset when I used the word Muslim. Oh you can't use the word Muslim. Remember this. And I'm okay with that, because I'm talking territory instead of Muslim." (*See* Meet the Press – July 24, 2016, NBC News at 1 (July 24, 2016) available at http://www.nbcnews.com/meet-the-press/meet-press-july-24-2016-n615706).

- Mr. Trump eventually began to refer to his Muslim ban as "extreme vetting." In a foreign policy speech delivered on August 15, 2016, Mr. Trump stated that the United States could not "adequate[ly] screen[]" immigrants because it admits "about 100,000 permanent immigrants from the Middle East every year." Mr. Trump envisioned that immigration applicants would be vetted along ideological lines, which would "screen out any who have hostile attitudes towards our country or its principles – or who believe that Sharia law should supplant American law." He called his proposal "extreme, extreme vetting." (*See* Donald Trump Foreign Policy Speech in Youngstown, C-SPAN (Aug. 15, 2016) available at https://www.c-span.org/video/?4139771/donald-trump-delivers-foreign-policy-address).

- On October 9, 2016, Mr. Trump was asked during the St. Louis presidential debate to explain whether or not his proposed Muslim ban still applied. Mr. Trump responded that "It's called extreme vetting." (*See* The American Presidency Project, Presidential Debates: Presidential Debate at Washington University in St. Louis, Missouri at 9 (October 9, 2016) available at http://www.presidency.ucsb.edu/ws/index.php?pid=119038).

36. After he was elected President of the United States, on December 21, 2016, Mr. Trump was asked if he planned to re-think or reevaluate plans to create a Muslim registry or ban Muslim immigration to the United States. He made his position crystal clear: "You know my plans. All along, I've proven to be right." *President Trump Remarks in Palm Beach, Florida*, C-SPAN (Dec. 21, 2016).

**B. President Trump Delivers on His Promise**

37. On January 20, 2017, Mr. Trump was inaugurated President of the United States.

38. Within days of being sworn in, President Trump reaffirmed his commitment to what he had come to call "extreme vetting." (*See* ABC News Anchor David Muir Interviews President Trump, ABC News at 13 (Jan. 25, 2017) available at http://abcnews.go.com/Politics/transcript-abc-news-anchor-david-

muirinterviewspresident/story?id=45047602).

**1. The First Executive Order**

39. Two days later, on January 27, 2017, President Trump signed Executive Order 13769 entitled, "Protecting the Nation from Foreign Terrorist Entry into the United States" ("First Executive Order").

40. During the signing ceremony for the First Executive Order, President Trump read its title and stated, "We all know what that means." (*See* Trump Signs Executive Orders at Pentagon, ABC News (Jan. 27, 2017), available at http://abcnews.go.com/Politics/video/trump-signs-executive-orders-pentagon-45099173).

41. President Trump described the purpose of the First Executive Order to be to "establish[] new vetting measures to keep radical Islamic terrorists out of the United States of America," elaborating, "we don't want them here." (*See* Sarah Pulliam Bailey, Trump Signs order limiting refugee entry, says he will prioritize Christian refugees, The Washington Post (Jan. 27, 2017) available at https://www.washingtonpost.com/news/acts-of-faith/wp/2017/01/27/we-dont-want-them-theretrump-signs-order-limiting-refugee-entry/?utm_term=.db861d9642ea).

42. Section 3(c) of the First Executive Order declared that immigrants and nonimmigrants from Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen "would be detrimental to the interests of the United States." The First Executive Order "suspend[ed] entry into the United States, as immigrants and nonimmigrants, of such persons for 90 days from the date of this order"—and provided for the possibility that the suspension could be extended.

43. The majority of the population in each of the seven countries in the First Executive Order is Muslim.

44. The First Executive Order also left the door open to expand the immigration ban

to nationals from more countries in the future. Section 3(d) ordered the President-appointed Secretary of State to request all foreign governments to provide the United States with information to determine if a person was a threat. Section 3(e) requested the Secretaries of Homeland Security and State to submit a list of countries recommended for inclusion in the ban, targeting any country that did not cooperate with requests made under 3(d). Section 3(f) enabled the Secretaries of State and Homeland Security to add any other countries recommended for further inclusion in the ban.

45. Section 5 of the first Executive Order was entitled "Realignment of the U.S. Refugee Admissions Program." Section 5(a) ordered the Secretary of State to initially suspend the U.S. Refugee Admissions Program ("USRAP") for 120 days.

46. After the 120 days, Section 5(b) directed the Secretaries of Homeland Security and State to prioritize refugee admissions "on the basis of religious-based persecution, provided that the religion of the individual is a minority religion in the individual's country of nationality." In a January 27, 2017 interview, President Trump confirmed his intent to prioritize Christians in the Middle East for admission as refugees. President Trump stated, "Do you know if you were a Christian in Syria it was impossible, at least very tough to get into the United States? If you were a Muslim you could come in, but if you were a Christian, it was almost impossible and the reason that was so unfair, everybody was persecuted in all fairness, but they were chopping off the heads of everybody but more so the Christians. And I thought it was very, very unfair. So we are going to help them." (*See* Brody File Exclusive: President Trump Says Persecuted Christians Will Be Given Priority As Refugees, Christian Broadcasting Network at 8 (Jan. 27, 2017) available at http://www1.cbn.com/thebrodyfile/archive/2017/01/27/brody-file-exclusive-presidenttrumpsays-persecuted-christians-will-be-given-priority-as-refugees).

47. Section 5(c) of the First Executive Order proclaimed that Syrian refugees are "detrimental to the interests of the United States" and suspended their entry indefinitely.

48. In an interview on January 28, 2017, President Trump's advisor, Rudolph Giuliani, confirmed that the First Executive Order was crafted to be a "legal" ban on Muslims. Mr. Giuliani stated that President Trump asked him for a "Muslim ban" and instructed Giuliani to "put a commission together" to "show [Trump] the right way to do it legally." (*See* Amy B. Wang, Trump asked for a 'Muslim Ban,' Giuliani says – and ordered a commission to do it 'legally', The Washington Post (Jan. 29, 2017) available at https://www.washingtonpost.com/news/the-fix/wp/2017/01/29/trump-asked-for-a-muslim-bangiuliani-says-and-ordered-a-commission-to-do-it-legally/?utm_term=.6ce151a30f4c; https://youtu.be/l9GKL6i38pI).

49. The State Department revoked approximately 60,000 visas within the first week of the signing of the first Executive Order.

50. A Department of Homeland Security draft report released on February 25, 2017 undermined President Trump's assertions that his targeted nationalities were tailored to counteract threats to national security. The report prepared at the request of the DHS Acting Under Secretary for Intelligence and Analysis concluded that citizenship was "unlikely to be an indicator" of terrorism threats against the United States. The draft report found that citizens of the seven countries targeted in President Trump's First Executive Order were "rarely implicated" in U.S.-based terrorism. (*See* https://www.documentcloud.org/documents/3474730-DHS-intelligence-document-on-President-Donald.html).

51. Specifically, the DHS report determined that of the 82 people inspired by a foreign terrorist group to carry out or attempt to carry out an attack in the United States since

March 2011, more than half were native-born U.S. citizens, and the remaining persons were from 26 countries—with the most individuals from Pakistan. Of the seven countries singled out in the First Executive Order, only Somalia and Iraq were among the "top" countries-of-origin.

52. Ten former national security, foreign policy, and intelligence officials including Madeline Albright, Avril D. Haines, Michael Hayden, John Kerry, John McLaughlin, Lisa O. Monaco, Michael J. Morell, Janet A. Napolitano, Leon E. Panetta, and Susan Rice, submitted a declaration before the Ninth Circuit, stating: "We all are…unaware of any specific threat that would justify the travel ban established by the [First] Executive Order." Further, the former officials stated "there is no national security purpose for a total bar on entry for aliens," warning that the First Executive Order "could do long-term damage to our national security." (*See Washington v. Trump*, Case No. 17-35105, ECF No. 28-2 at 3 (9th Cir., Feb. 6, 2017)).

53. Hundreds of State Department officials signed a memorandum accessed through the State Department's "Dissent Channel" stating that the Executive Order "runs counter to core American values" including nondiscrimination and that a "vanishingly small number of terror attacks on U.S. soil have been committed by foreign nationals" in the country on visas.

54. On February 3, 2017, the United States District Court for the Western District of Washington entered a temporary restraining order ("TRO") precluding Defendants from implementing Sections 3(a), 5(a)-(c), and 5(e) of the First Executive Order. On February 9, 2017, the Ninth Circuit issued a per curiam decision denying Defendants' emergency motion for a stay of the District Court's order.

**2. The Second Executive Order**

55. On February 16, 2017, Defendants advised the United States Court of Appeals that "the President intends in the near future to rescind the [First Executive] Order and replace it with a new, substantially revised Executive Order." (*See* Appellants' Supplemental Brief on En

Banc consideration at 4, *Washington v. Trump*, No. 17-35105 (Feb. 16, 2017), ECF No. 154).

56. On March 6, 2017, the White House revoked the First Executive Order and issued Executive Order 13780 ("Second Executive Order").

57. The Second Executive Order is again titled "Protecting the Nation from Foreign Terrorist Entry into the United States."

58. In the weeks between the President's representation that he would rescind the First Executive Order and the March 6, 2017 Second Executive Order, President Trump and his advisors did not waver in their commitment to keeping the President's campaign promise of a Muslim ban.

59. On February 21, 2017, President Trump's senior policy advisor, Stephen Miller, reported the new executive order would have "mostly minor technical differences." Mr. Miller explained that "you're still going to have the same basic policy outcome for the country, but you're going to be responsive to a lot of very technical issues that were brought up by the court and those will be addressed." (*See* Miller: New order will be responsive to judicial ruling; Rep. Don DeSantis: Congress has gotten off to a slow start at 2 (Feb. 21, 2017) available at [http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-beresponsive-to-judicial-ruling-rep-ron-desantis/](http://www.foxnews.com/transcript/2017/02/21/miller-new-order-will-beresponsive-to-judicial-ruling-rep-ron-desantis/)).

60. Section 1 of the Second Executive Order is titled "Policy and Purpose," and states that "[i]t is the policy of the United States to protect its citizens from terrorist attacks, including those committed by foreign nationals."

61. Section 1(h) describes two instances of persons committing terrorism-related crimes in the United States after entering the country either "legally on visas" or "as refugees": (i) "in January 2013, two Iraqi nationals admitted to the United States as refugees in 2009 were

sentenced to 40 years to life in prison, respectively, for multiple terrorism-related offenses"; and (ii) "in October 2014, a native of Somalia who had been brought to the United States as a child refugee and later became a naturalized United States citizen was sentenced to 30 years in prison for attempting to use a weapon of mass destruction."

62. Section 2 of the Second Executive Order is titled "Temporary Suspension of Entry for Nationals of Countries of Particular Concern During Review Period," and Section 2(c) of suspends the "entry into the United States of nationals of Iran, Libya, Somalia, Sudan, Syria, and Yemen." Iraq is omitted from the ban.

63. As with the First Executive Order, the majority of the population in each of the six countries identified in the Second Executive Order is Muslim.

64. Under Section 3, the suspension of entry pursuant to Section 2 applies only to foreign nationals of the designated countries who: (i) are outside the United States on the effective date of this order, (ii) did not have a valid visa at 5:00 p.m. EST on the date of the First Executive Order, and (iii) do not have a valid visa on the effective date of this order. Section 3 also creates exemptions for lawful permanent residents, foreign nationals paroled into the United States, foreign nationals with valid travel documents such as advance parole, dual nationals traveling on passports issued by a non-designated country or on diplomatic visas, and foreign nationals who have been granted asylum as well as refugees who have been admitted to the United States.

65. Section 3 provides for various "exceptions" and potential "waivers" to Section 2's suspension, giving certain federal officials discretion to decide on a "case-by-case basis" to allow entry to certain foreign nationals otherwise barred by Section 2. There is no process provided for obtaining a waiver under Section 3.

66. Section 6(a) of the Second Executive Order suspends the "travel" of all refugees to the United States and all decisions by DHS on applications for refugee status for 120 days. Like the First Executive Order, the Second Executive Order permits the Secretaries of State and Homeland Security, and the Director of National Intelligence, to expand the ban beyond 120 days when it is determined that countries have failed to implement the "additional procedures" identified by Defendants as necessary "to ensure the security and welfare of the United States."

67. Pursuant to Section 14, the Second Executive Order take effect on March 16, 2017. On March 15, 2017, the United States District Court for the District of Hawai'i entered a TRO, temporarily enjoining Defendants form enforcing or implementing Sections 2 and 6 of the Second Executive Order across the United States.

## III. INJURY TO PLAINTIFFS AS A RESULT OF THE SECOND EXECUTIVE ORDER

68. As alleged above, Ms. Huff and her fiancé have submitted all the required information and support and gone through all the requisite steps for the K-1 visa to be issued to Ms. Huff's fiancé. No grounds for inadmissibility exist. But for the Second Executive Order, the K-1 visa would issue to Ms Huff's fiancé.

69. Ms. Heydari and her fiancé have also submitted all the required information and support and gone through all the requisite steps for the K-1 visa to be issued to Ms. Heydari's fiancé. No grounds for inadmissibility exist. But for the Second Executive Order, the K-1 visa would issue to Ms Heydari's fiancé.

70. Ms. Huff and Ms. Heydari are both irreparably injured by the Second Executive Order. The Supreme Court of the United States has repeatedly found that the right to marry is a fundamental one, firmly protected by the Constitution. The Second Executive Order severely restricts that fundamental right by banning the issuance of K-1 visas to Ms. Huff and Ms.

Heydari's fiancés, which would have otherwise been issued, preventing these Plaintiffs from marrying those fiancés.

71. In addition, because of the time restriction on many documents submitted in support of the K-1 visa, including medical records, police background checks, and the K-1 petition itself, banning the issuance of K-1 visas to Ms. Huff and Ms. Heydari's fiancés for even a limited period of time puts their petitions severely at risk of further delay and administrative processes, despite the fact that they have met all requirements for the visas to issue and no grounds for inadmissibility exist.

72. Given the real and irreparable harm Plaintiffs are suffering and will continue to suffer, preliminary and permanent injunctive relief is warranted.

## COUNT I

### (First Amendment – Establishment Clause)

73. The foregoing allegations are realleged and incorporated by reference herein.

74. The Establishment Clause of the First Amendment prohibits the Federal Government from officially preferring one religion over another.

75. Sections 2 and 6 of President Trump's March 6, 2017 Executive Order, as well as Defendants' statements regarding the Executive Order and their actions to implement it, are intended to disfavor, and have the effect of disfavoring, the Islamic faith.

76. The Second Executive Order violates the Establishment Clause and is unconstitutional.

## COUNT II

### (Fifth Amendment – Equal Protection)

77. The foregoing allegations are realleged and incorporated by reference herein.

78. The Due Process Clause of the Fifth Amendment prohibits the Federal

Government from denying equal protection of the laws, including on the basis of religion and/or national origin, nationality, or alienage.

79. The Second Executive Order was motivated by animus and a desire to discriminate on the basis of religion and/or national origin, nationality, or alienage.

80. The Second Executive Order differentiates between people based on their religion and/or national origin, nationality, or alienage and is accordingly subject to strict scrutiny. It fails that test because it is over- and under-inclusive in restricting immigration from security reasons.

81. Statements made by President Trump and his advisors provide direct evidence of discriminatory motivations underlying the Second Executive Order.

82. The Second Executive Order is not rationally related to a legitimate government interest; nor is it narrowly tailored to serve a compelling government interest.

83. Sections 2 and 6 of the Second Executive Order, as well as Defendants' statements regarding the Order, discriminate against individuals based on their religion and/or national origin, nationality, or alienage without lawful justification.

84. The Second Executive Order violates the Equal Protection guarantees of the Fifth Amendment and is unconstitutional.

## COUNT III

### (Fifth Amendment – Substantive Due Process)

85. The foregoing allegations are realleged and incorporated by reference herein.

86. The right to international travel is protected by the Due Process Clause of the Fifth Amendment.

87. Citizens have a constitutionally protected interest in specific non-citizens' ability to travel to the United States. The Second Executive Order infringes upon those rights for

Plaintiffs and numerous individuals without any legal justification.

88. The Second Executive Order violates the substantive Due Process guarantees of the Fifth Amendment and is unconstitutional.

**COUNT IV**

**(Fifth Amendment – Procedural Due Process)**

89. The foregoing allegations are realleged and incorporated by reference herein.

90. The Due Process Clause of the Fifth Amendment prohibits the Federal Government from depriving individuals of liberty interests without due process of law.

91. Non-citizens, including lawful permanent residents and non-immigrants holding valid visas, have a liberty interest in leaving and entering the country, and in being free from unlawful detention. Citizens have a constitutionally protected liberty interest with respect to non-citizen relatives who are deprived of due process.

92. The Due Process Clause establishes a minimum level of procedural protection before liberty interests can be deprived. Citizens and non-citizens must be given an opportunity to present their cases effectively, which includes a hearing and some consideration of individual circumstances. The Second Executive infringes upon those rights for Plaintiffs and numerous individuals without any legal justification.

93. Second Executive Order violates the procedural Due Process guarantees of the Fifth Amendment and is unconstitutional.

**COUNT V**

**(Immigration and Nationality Act)**

94. The foregoing allegations are realleged and incorporated by reference herein.

95. The INA provides that "[e]xcept as specifically provided" in certain subsections, "no person shall receive any preferences or priority or be discriminated against in the issuance of

an immigrant visa because of the person's race, sex, nationality, place of birth, or place of residence." 8 U.S.C. § 1152(a)(1)(A). The INA also establishes specific criteria for determining terrorism-related inadmissibility.

96. These provisions of the INA apply to non-immigrant fiancé visas. When issuing a nonimmigrant fiancé visa, eligibility "must" be determined "as if the alien were an applicant for an immigrant visa." 22 C.F.R. § 41.81(d).

97. Sections 2 and 6 of the Second Executive Order violate the INA by discriminating on the basis of nationality, ignoring and modifying the statutory criteria for determining terrorism-related inadmissibility, and exceeding the President's authority under the INA, including under 8 U.S.C. §§ 1182(f) and 1185(a).

## COUNT VI

**(Substantive Violation of the Administrative Procedure Act through Violations of the Constitution, Immigration and Nationality Act, and Arbitrary and Capricious Action)**

98. The foregoing allegations are realleged and incorporated by reference herein.

99. The Administrate Procedures Act requires courts to hold unlawful and set aside any action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; "contrary to constitutional right, power, privilege, or immunity"; or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)-(C).

100. In enacting and implementing the Second Executive Order, Defendants have acted contrary to the First and Fifth Amendments to the United States Constitution.

101. In enacting and implementing the Second Executive Order, Defendants have acted contrary to the INA and RFRA. Defendants have exceeded their statutory authority, engaged in nationality- and religion-based discrimination, and failed to vindicate statutory rights

guaranteed by the INA.

102. In enacting and implementing the Second Executive Order, Defendants have also acted arbitrarily and capriciously. Among other things, the Second Executive Order purports to protect the country from terrorism, but applies to millions of people who have no connection to terrorism.

## COUNT VII

**(Procedural Violations of the Administrative Procedure Act)**

103. The foregoing allegations are realleged and incorporated by reference herein.

104. The APA requires courts to hold unlawful and set aside an agency action taken "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

105. The Departments of State and Homeland Security are "agencies" under the APA. *See* 5 U.S.C. § 551(1).

106. The APA requires that agencies follow rulemaking procedures before engaging in actions that impacts substantive rights. *See* 5 U.S.C. § 553.

107. In implementing the Second Executive Order, federal agencies have changed the substantive criteria by which individuals from the six designated countries may enter the United States. This, among other actions by Defendants, impacts substantive rights.

108. Defendants did not follow the rulemaking procedures required by the APA in enacting and implementing the Executive Order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays that the Court:

a. Declare that Sections 2 and 6 of President Trump's Executive Order of March 6, 2017 are unauthorized by, and contrary to, the Constitution and laws of the United States;

b. Enjoin Defendants from implementing or enforcing Sections 2 and 6 across the nation;

c. Enjoin Defendants from implementing or enforcing Sections 2 and 6 against Plaintiffs;

d. Pursuant to Federal Rule of Civil Procedure 65(b)(2), set an expedited hearing within fourteen (14) days to determine whether the Temporary Restraining Order should be extended; and

e. Award such additional relief as the interests of justice may require.

Date: March 16, 2017

Respectfully submitted,

/s/ *James J. Boland*

James J. Boland
John T. Shapiro
Katheleen A. Ehrhart
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60611
312.360.6000 (phone)
312.360.6520 (fax)

*Attorneys for Plaintiffs Gina Marie Huff and Soulmaz Heydari*

**(Additional Counsel on Following Page)**

**Additional Counsel:**

Michael D. Freeborn
Matthew R. Campobasso
Lauren S. Berheide
Martin Syvertsen
FREEBORN & PETERS LLP
311 South Wacker Drive, Suite 3000
Chicago, IL 60611
312.360.6000 (phone)
312.360.6520 (fax)

Fiona McEntee
McENTEE LAW GROUP
875 N. Michigan Avenue
Suite 3100
Chicago, IL 60611
773.828.9544 (phone)

*Attorneys for Plaintiffs Gina Marie Huff and Soulmaz Heydari*

Ladan Mirbagheri-Smith
(*pro hac vice application to be submitted*)
MIRBAGHERI & SMITH LLP
1688 East Gude Drive, Suite 201
Rockville, MD 20850
301.309.1223 (phone)
301.309.1229 (fax)

*Attorneys for Plaintiff Soulmaz Heydari*